Case No. 22-5262, L'Association des Américains Accidentels et d'Al, A Balance, v. United States Department of State et d'Al. Mr. Schreiber for the A Balance, Ms. Tippleton for the Appellees. Good morning, Mr. Schreiber. Good morning, Your Honor, and may it please the Court. My name is Noam Schreiber, and together with Mark Zell, I represent the plaintiffs. Thank you for allowing me to participate in today's argument remotely. I would like to reserve three minutes for rebuttal. Your Honors, before I discuss Plaintiff's Fifth Amendment claim, I would like to briefly address the District Court ruling that the challenge to the suspension policy was moot, or is moot. This challenge is not moot because the government failed to carry its heavy burden of making it absolutely clear that it would not revert back to this policy of suspending or otherwise indefinitely delaying renunciation services with the simple stroke of a pen. This was not a rulemaking process. This was a simple policy that it issued, and it could happen again. And during the— Are you saying they could just—you said with a stroke of a pen, wouldn't they have to at least wait for another pandemic? Well, there have to be some circumstances, Your Honor, that would— Some circumstances beyond their control? Like a pandemic? Correct, a pandemic or other global crisis. Right, okay. Yes. So usually when we invoke the voluntary cessation and we use the stroke of the pen line, that means that return to the prior policy is actually entirely within the control of the defendant here, the government. And you just said that they couldn't actually return to the prior policy. It's not within their control at all. It's simply some other supervening out of their control circumstance, again, whether it's another pandemic or some other international crisis that none of us can foresee. Do you have—what's your best case that in circumstances like that, we still treat this as a voluntary cessation? Well, my first comment is that we didn't ever invoke the voluntary cessation exemption. What we did invoke is the capable of repetition yet evading review. But both tests or both exemptions have similar— Well, how does this evade review? You've got plenty of time. You have plenty of time. Well, it evades review by the fact that, according to the government, the suspension is no longer in place, and therefore it's being moved. And evading review is judicial review. So that policy is, according to the government, is moved. However, going to the— You waited—am I correct? Almost two years after the pandemic? You filed your complaint at the end of 2021, correct? Correct. Okay, so you waited, you know, 20 months after the pandemic started to challenge the suspension. And so we don't normally consider things to be of such a short-fused nature that they are capable of repetition yet evading review when someone waits 19 months to file. Your Honor, the issue is— You didn't have good reasons. I'm not saying you didn't have good reasons. I'm just saying usually capable of repetition is really breakneck speed emergency litigation that still, even under that case, couldn't be resolved by the courts. The plaintiffs did not—this was a last resort issue, and there were—the plaintiffs did not—they're not litigators, and they don't jump to litigate these issues. So, yes, it wasn't immediately filed during the pandemic and when the suspension went into effect, but it also wasn't clear at that point when—what was going on. I mean, plaintiffs had no idea whether they would receive these appointments within a year or less, and therefore that explains the delay. But courts have ruled, including the Supreme Court, that when there is no rulemaking and there's no requirement for heavy rulemaking and it's rather just a policy decision by the agency, that that generally suffices to satisfy the evading review requirement. But there would be a different situation. There would be different circumstances, and the length of the suspension could be different. I mean, this is not a situation like an election or a school year where there's a standardized occurrence, the length of which is set in some kind of regular process. This is a fluid kind of response to an unknown—a public health crisis of unknown duration. So it seems like it's not an exact fit for the capable of repetition evading review doctrine. Your Honor, I respectfully don't exactly share the same view. The problem—the issue is that this is not—the suspension, as we briefed, is not over. I mean, the government has claimed it is, but there is still an effective suspension in place. Let's talk about that. That's a different policy. That's the more decentralized policy giving discretion to overseas posts to decide when and how to prioritize the resumption of services. And with respect to that, I'm just trying to get a focus on the sort of statement of the right. The right is the right to expatriate or the right to expatriate and get a certificate from the government? Because an individual can expatriate without this interview. Isn't that correct?  Your Honor, the individual can expatriate without an interview under 1481, A-1, A-2, A-3, and A-4. A-5 is quite unique, and the expatriation won't have any effect unless that interview is given. As this court pointed out in Farrell v. Blinken, the interview, the oath, the in-person requirement, the actual oath, and the act of expatriation and making that oath are connected. You can't have one without the other. I think the language in Farrell is if somebody expatriates alone in a forest and the State Department isn't there to hear it, did he or she expatriate? And the answer in Farrell was no. So the suspension or temporary suspension, I'm sorry, or delay effectively prevents these U.S. citizens from ridding themselves of their U.S. citizenship. And that can be over a year. The record indicates that most, if not all the plaintiffs, the average wait was over a year to expatriate. And during that time, they were suffering real harm, whether ideological and associational harm or day-to-day harm in their financial transactions. Did you make a First Amendment claim of ideological and associational harm? We didn't. In this case, we did not invoke the First Amendment. But we in our briefing, both here and in the district court, we to to support the claim that the right to expatriate is a fundamental right. We linked the right to the First Amendment as well. Can I ask you, you used the verb what was a long delay and they had to, past tense, wait a long time. You had 11 individual plaintiffs in this case, as well as the association. Can you tell me which of those 11 still has not had the opportunity to start this renunciation process, at least interviews or actually accomplishing it? Yes, Your Honor. To the best of my knowledge, seven out of the 11 plaintiffs have either had an appointment since this litigation was commenced and or received their certificate of loss of nationality. As for the association. You said seven out of 11. So who are the other four and what's their status? The other four or three, I believe. One second. You just said seven out of 11. Maybe you meant eight out of 11? Perhaps. I'm referring to Christopher Lazar's. I'm not sure of his status. Mark Lewis and Ann Mislin, to the best of my knowledge, have not yet had an appointment yet. Have they contacted? Well, the government said they haven't even contacted the post. I do not. I do not have information on that. Well, they haven't contacted the post, the delays on them. Would you be able to follow up with a letter updating us on the status of Christopher Lazar's, Ann Mislin and Mark Lewis? Yes, Your Honor. If I may, Your Honor. Before you finish, just to be clear. I'm sorry. Do we know exactly what the status is? There's also another one. I wasn't clear on the record, but maybe you know, was Jeremiah Bornstein. But maybe, you know, whether he's already. I will. I will update you on him as well. All right. But as to everyone else, maybe they're already had an interview. You know, they're already well into the process or have actually renunciated. Is that correct? Correct, Your Honor. Have they all renunciated or there's some of them still? Most of them I can when I saw the letter, I will give an exact detail of each one. But most of them have received their certificate. Some have only had an appointment. Okay. And then the other question I had is you asked for the relief you seek in this case is an injunction through a blanket injunction. Telling ordering the government, the State Department, I guess, to direct all of its embassies and consulates to work at a reasonable pace in processing applications under a five to renunciate. Is that correct? That's a relief you've asked for? Correct, Your Honor. Okay. Tell me how such global relief could work in this context. For example, what would be a reasonable pace for the embassy in Sudan right now? Is there one reasonable pace? Thank you, Your Honor. I would what we what we tried to portray in the briefs here is that there is not only a delay, but we put that under in the background, how the government treats nonimmigrant visa services. In that regard, we've seen and I think the record indicates, and it doesn't appear that the government argues otherwise, that it processes many more nonimmigrant visa applications at a much faster rate. That certainly was the case when this lawsuit was filed. And that also appears to be the case as well. So when asked when the question is how, what type of how to formulate relief? Once the government is ordered and instructed that the right to renounce U.S. citizenship is not like any other service, routine service it provides, and especially not like nonimmigrant visa services, its priorities will naturally and necessarily change. The government now. You're seeking an injunction that uniformly across the entire globe orders embassies to reorder their priorities, regardless of individualized conditions in each location? We're asking that the court declare the status of the right. And based on that status. Well, you have sought relief also under the APA that doesn't require anybody to declare any status of of this right. Okay, so you have sought relief on different alternative grounds here. And of course, we try to avoid constitutional rulings where possible. And you have sought this injunctive relief. I'm just trying to even understand how this is the type of place that would be appropriate for a global rather than individualized or consulate by consulate or embassy by embassy form of relief. Right. I mean, surely the same prioritization isn't going to apply for the embassy in Sudan or Ukraine, as it might say, Canada. And then we need to know if you actually have members who are seeking to renunciate in each of those places and and how much delay they're encountering. Your complaint says that even before the pandemic, people had to wait, quote, months before they could get an interview. And now you say in your complaint after the pandemic and after there's been some return to normal normalized services for the most part, it varies from consulate to consulate and embassy to embassy. I think people are having to wait months. So I just am really having trouble understanding what how this is the type of case that would be appropriate for any form of global relief as opposed to individualized relief. Well, I have two comments. One response is that the rise in renunciation services is the global trend at this point, and therefore there is no there is no the future will reasonably what will happen in the future seems to indicate that there will be the backlog will just increase. And I don't know what has happened in the last year, because according to the government's briefing, and I didn't see any rebuttal of this in your reply brief, the backlogs have decreased in the last year because they've come out of the pandemic for the most part and been able to catch up. Correct, Your Honor, but the, the government denied you denied is that sort of a factual dispute in this case, I don't know if it's a factual because this is, it says we're bordering on speculative to what's going to happen in the future. However, if the past is indicative of anything, the global trend in renunciation services is on the rise. And I'd like to just point this out in the companion case in the renunciation fee case, which we've mentioned in the briefs here. In that case, the government has indicated that it intends to decrease the fee, which currently stands at $2,350 as a precondition to renounce back to its 2010 value of $450. Once that happens, it is reasonable to assume that in all consulates and all U.S. missions around the globe, the increase in global, in the demand for renunciation services will. So you want an injunction for them to go faster globally? Yes, you have to go faster and has to reprioritize because in the future, you anticipate there will be more applications and an increase in backlogs. Is that what I understand? No, Your Honor, our, our, our complaint, our complaint and our is asking for what happened is based on the record before the court, which. Okay, so that doesn't include any of the stuff you just talked about. No, but, but if I was, I was, I was on the record before the court, I'm just back to my question where backlogs have decreased and it is. I mean, do you dispute that that there are country by country circumstances and maybe even regions within countries? If you're near the Tigray region in Ethiopia, that's going to be very different being in the capital that there are circumstances on the ground that affect timing. There are some that would be reasonable. There are circumstances and each state has its own. Each country has its own circumstances. But the question here is even regions within countries have their own circumstances. The question here is one of how to view this, right? I don't think it's not going to be the right. I'm asking how to view the relief that sought and whether global, excuse me, whether a global type of global relief. That the association is seeking the individuals want their own processing, but the association wants global relief and whether that's even tenable in a situation like this. The relief that goes to standing. That's why I'm asking all this now. It goes to standing. The relief the association is asking your honor stems from how stems from how the government and I apologize for repeating myself, but how the government is treating this right. And I understand. So that's why I mentioned priorities. And I'm just again, I'm asking. I'm sorry. Okay. No, no, no. I'm sorry. It's just asking one more time and then I'll stop. So my colleagues can ask questions. But what I want to pin down what I'm trying to get here is. Is you as the association are also here as a plaintiff and you need to show that individualized relief. Is it necessary in a case like that? In fact, a sort of global cross cutting relief. Relief is available and that feels very hard to demonstrate to me in this case because we can take as a given. And I think it's why you said you only want everyone to go at a reasonable pace in your complaint. You just want an injunction for a reasonable pace. But it's I don't even know what that means. I don't know how the government would even know what that means. If this is actually a unique situation, implicating foreign relations and foreign conditions where any relief would have to be tailored at a bare minimum. Office by office around the world. And there's like two hundred or something. I remember right. Two hundred or something or three hundred or something. These embassies and consulates around the world. Wouldn't it? I mean, it would have to be tailored, right? You'd have to let it be different priorities in. Sudan and Ukraine and Haiti. Right now, then perhaps in other areas, you would agree to that, correct? I would I would not want to have the government not be able to tailor or use its discretion per embassy or per U.S. mission. But the relief being sought is not the same. I'm sorry. I think we're on the same page there. Yes, but that may be true, Your Honor. But the relief being sought is against the State Department and how it treats this right. And again, and I apologize for repeating myself on this, but once the State Department is told that it must treat this right with the respect it deserves, it will naturally and necessarily require need to direct its embassies to reprioritize. And if that requires allocating more services per embassy, per U.S. mission, how the government does that, that is their that's their homework. I can't I can't say how they do that. That's their expertise. So you want an injunction reordering the priorities and operations, staffing and funding of foreign embassies and consulates? We want a declaratory judgment declaring that this right. You want an injunction too? That injunction is not is not detached from the declaratory relief we're seeking. It can't be seen in some vacuum. The injunction itself relates to the declaratory relief. They're one in the same. And it's one and one once once declared and once recognized as a fundamental right, the injunction, the nature and the scope of the injunction will flow from there, Your Honor. OK. You guys have questions. And I'm just going to ask one follow up question, I apologize about in your complaint where you said prior to the pandemic, waitlists would normally, quote, would quote normally last month and quote. Do you know how many months that was not offhand, Your Honor? I can I can use that in the letter as well, if that's necessary. I guess my my only question for you is, you know, the district court applied Chalks to Conscience County of Sacramento. And I think I think your briefing reflects that Luxburg is probably the right due process analysis for a situation like this. Yes, Your Honor. Thank you very much. We'll give you a couple of minutes. We'll hear from the government now. Thank you, Your Honor. Thank you, Your Honor. And so no longer at issue. Instead, this case is about, as Your Honor stated, state's ability to make its own decisions about how to prioritize multiple high stakes demand. Posts around the world are actively managing waitlists of individuals seeking to irrevocably relinquish their US citizenship. Those waitlists do not implicate any right protected by the Fifth Amendment due process clause, and they readily satisfy the APA's demands for reasonableness under this court's case law. The district court was therefore correct to rule in the government's favor, and we ask this court to affirm. There are these other ways to renounce citizenship, but I gather that everybody agrees that this subsection five is nonetheless needed by by people who want to to show for purposes of banking and taxation and the like that they've successfully. So, if I can clarify that, Your Honor, so there are, of course, seven voluntary acts listed under 1481. That's the section of the INA that governs and acts of to lose citizenship. If I was one of them, the first five are under the State Department's control. A-1 actually does also require an in-person appearance. This court addressed that in Farrell, and here's why. A-1 is, of course, relinquishing citizenship by way of naturalization to another country. It's not the case that all naturalization results in loss of US citizenship. It has to be naturalization with the intent to relinquish one's citizenship. The State Department, under its authority as given to it by Congress to regulate under this act, has required an in-person appearance at a consulate for that individual to confirm that their naturalization was done with the intent to relinquish citizenship. So, yes, there are multiple ways to give up one's US citizenship. Congress has provided that renunciation before a diplomatic or consulate officer is one of those options, and we understand that's the option that these plaintiffs seek to exercise. Does number two, taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state, does that also require them to come to it in person? So, I believe my understanding, Your Honor, and I was trying to recall conversations with our State Department colleagues. My understanding is that all five of the options that are under the State Department's control require, by means of State Department regulations, an appearance at a consulate to sort of confirm, again, that voluntariness and intent to relinquish citizenship. I would need to double check that before I was certain, Your Honor. Okay. Maybe you could let us know. I'd be happy to. And one of them is, I mean, people could come to the United States and get an appointment. Is there any backlog on that? Options six and seven, Your Honor, and it's number six that's making a formal written renunciation in the United States, those are pursuant to the control of the Attorney General of the State Department. I'm not aware as to whether or not there is a backlog on those options. And we don't want to encourage seven. Do you happen to have an update on the status of the individual plaintiffs? I'm glad you asked, Your Honor. So, we have been actively working to get an updated status. Your Honor mentioned the ongoing crisis in Sudan. So, the office at State Department headquarters, the Bureau of Consular Affairs that we would work with to get those updates has been all hands on deck in assisting the emergency evacuation from Sudan. So, we do expect to have an update for the court. And I apologize, we were not able to get that before today's hearing. The complaint is all about the suspension, given the timing that the complaint was filed. But I take it you have read the complaint, and as the case has evolved, is not just challenging the initial suspension, but also the subsequent policies sort of returning, you know, setting a framework for returning to our new normal. Is that correct? That's correct, Your Honor. We understand them to be challenging or sort of to be bringing two sets of challenges. And I think if you look at the complaint in those causes of action, it's listed as suspension, and then they call it effective suspension or the wait list policy. So, yes, at this stage on appeal, we are treating those as two categories of challenges. Of course, we think the challenges to the suspension are moot. The challenges to the ongoing delays we think are active. Okay. Do you have any sense of, because they say in the complaint, even before COVID, or all of the suspension, anything, there was wait lists worth four months in their words. And now it seems to be four months in some places. Whether it's back to normal levels or just don't know at this point. I'm not aware, Your Honor, of what sort of the average wait list was prior to the pandemic. I think the second pending declaration gives a good bit of detail about the level of operations, at least as of June of twenty, twenty two. I can point out, for example, that the consulate in Paris, or excuse me, the embassies in Paris at that time had come up to providing an average of four appointments per week. And Mr. Benning states that prior to the pandemic, it had an average of two appointments per week. Of course, there are also changes in demand, so I couldn't speak to whether the sort of current wait list is is a longer time period than before. I'd be happy to ask the State Department if they have statistics on on the wait prior to the pandemic. I was my colleagues jump in. You didn't challenge the associations. Association standing in this case. And I'm curious about the third prong, which normally is readily met in a junk cases, but reading the materials in this case, at least struck me as a question. And so a standing question whether, in fact, this is a situation where. Non individualized junk to relieve categorical, if it's even a possibility, both as a factual matter and as a matter of difference to foreign affairs. So, your honor, we certainly agree that an across the board injunction requiring the department to sort of prioritize these applications, no matter what else is going on would not be appropriate. And so, in that sense, we agree that that relief is not available. We have, of course, treated that in our briefing as an issue of the merits rather than standing. Why am I wrong to think about it that way? I'm not sure that you are your honor. Candor we haven't discussed it that way in our briefing. I don't think we would object in any way to a decision that said the association lacks. Of course, you wouldn't object if you went, but I'm really trying to understand because usually that phrase means, you know, you're gonna have to put individual plaintiffs on to testify about facts or something to get relief or damages relief or something like that. I mean, this is a bit this is a bit of a different, different, different problem where you really would kind of, you know, would it be appropriate to issue an injunction for embassies for which there are no members seeking renunciation? Would it even is it appropriate? And if each one has to be individually tailored based on whether there's a member, and then the ground conditions within that region country, or maybe portion of country, then it feels to me. Not like the normal junk of relief normal associational standing relief, but it's, it's, it's, it's different than we normally encounter when applying that paradigm. I agree your honor it would be extraordinarily messy to try to sort out what injunctive relief would would look like here and it would require delving into the department's priorities conditions at various locations. There is your honor I think is asking in part about sort of the number of posts that could potentially come within the scope of that relief. So, there is a declaration from the association that's in the record, and it lists, I believe, eight individuals who sort of are specifically seeking to renounce your citizenship. And that's a one thirty five and thirty six to my recollection. I believe all of those individuals were seeking to renounce in France. I could be wrong about that, but it's not a wide variety of posts that they're seeking to renounce that. And so, I think there is an argument that any relief to the association on the basis of the record here with, in theory, have to be restricted to the post at which its members are are seeking relief. But again, if it turns out the members that they've listed actually are all done or in process, or them for their own reasons, haven't even started the process, which just would not be they just aren't entitled to any kind of relief. Then that's why I was asking about the association, because it seems to me, at least from your briefing, which first raised this issue about the individual status. But we may end up depending on what it tells us haven't decided the association alone has standing. Yes, so first of all, just so that I'm clear, those eight members I noted are not named plaintiffs. They are other individuals who are members of the association as of our last update. And again, we will submit a formal update to the court as soon as we can. As our last update, there was one of those individuals name is, I think, Olivier Valerie. He has an appointment scheduled for November of this year. And so at least it's that individual. There's no mood is concerned as a present. And so, of course, that would mean the association has the required one member who's thing is right, but not. So, I may not have been paying close enough attention, but with respect to submissions by the parties about the status insofar as, you know, it of the name plaintiffs. It seems for purposes of evaluating if we need to separately evaluating the standing of the association. We would also want updates with respect to the status of the persons identified as members who support the standing who are put forward as supporting the standing of the association. I think that's correct. Your honor. We would plan to provide that as part of our update as well. I should also point out that the declaration from the association's president does assert that. I think he claims more than 800 individual members who he believes are seeking turnouts. And so, even in the event that those eight individuals had all completed the process, which, as I said, as of this point, they have not, there would at least be a question mark of what to do with that. I think the question whether that's adequate actually for us to credit for purposes of station. Yes. Standing. I have a slightly different question about the under 1481. And you and your brief characterize the right that they're asserting as, you know, under the, the Supreme Court's guidance that we should carefully describe the right at issue. And what I take you to be describing as the right at issue is the ability to complete an assessment interview and take the oath of renunciation within a particular timeframe. I'm not sure. I mean, it seems more that they're asking for the ability to renounce citizenship and that what they're saying impinges on that is the inability to get this documentation. Let me ask you, as a, as a factual matter, if I were, for example, to take an oath or affirmation of formal declaration of allegiance to a foreign state with, you know, voluntary and knowing intent to renounce my citizenship in January. But only succeed in in December in getting a certification, would the renunciation be effective as of January with with the certification from the government as a result of the interview and all of that confirmation? Would it recognize the action that I took in January or would it be effective only as of the time of the issuance? So, the answer is different depending on which of those five is acted on. So, for a five, which is the renunciation for diplomatic officer of the United States. What happens is there is the, the, the interview, the oath is sworn, some period of time passes, the certificate of lost nationality is issued. The, it's not sort of effect, the lost nationality is effective at the time that the CLN is issued. However, it is backdated to the date of the renunciation oath. So, for plaintiff's purposes, they, they would not be able to sort of demonstrate or to say that they had lost their citizenship until that certificate is issued. But it's effective backdated to the date of the oath. So, to the extent that it affects the United States is, for example, tax treatment. Yes. And there is actually a provision of the tax code, I believe, cited in plaintiff's complaint, actually, that describes this explicitly. There's individuals who have completed expatriation are subject to taxation for sort of the portion of the tax year until the date that they took the oath. They took the, yes, and let me clarify if it's under a five, it's the date that they took the oath. I believe that under a one through four, it is actually the date that the CLN, the excuse me, the certificate of loss of nationality is issued and that's the difference. So, my understanding is that the State Department sort of recognizes the date at which point it has confirmed that a person has voluntarily completed an act and with and with intent to relinquish citizenship under a one through four. I just point out an argument in their brief. You seem to be most troubled by what I think they would call prioritization of nonimmigrant visas over their enunciation process, which I guess then feels like maybe just favoritism of their rights. Do you have a response to that? I do your honor and I think the banning declaration and particularly the supplemental any declaration is very helpful on this point. So, particularly at the height of the pandemic, the State Department gave post clear instructions to prioritize emergency services and mission critical services to include services that were sort of important to humanitarian needs and to the national interest. So, the bank declaration discusses the visas that were being issued were visas for humanitarian emergencies, for medical professionals, something we needed to come to the United States, people who were involved in food production and air and sea crew. I would also add a very important one relevant to the interest of American citizens is family reunification. So, non citizen spouses or family members of American citizens who needed to be able to travel to the United States to be reunited with their American citizen family. And that was also a top priority. And the other 2, I would add in, of course, are the evacuation from Afghanistan. There were special provisions for some individuals coming from Afghanistan to the United States. Those were congressionally directed. But is this still true in 2022? And she did her supplement declaration is because I'm just trying to understand what is this concern about prioritizing nonemigrant visas of renunciation even now when there's still wait lists. So, under the framework that has been in place since the fall of 2021, there is an sort of ongoing prioritization of those sort of most important needs. And of course, the other thing is that this varies on a post by post basis. So, some posts may have more capacity and you may have the staff to provide visa services, whereas others do not and would be more focused on providing American citizen services. Okay, it's the volume of nonimmigrant visa. I'm also trying to feature sort of ratio. Yes, there's for every 1 renunciation, there's 200 nonimmigrant visa applications in the process. So, I'm not aware. I'm not aware of comprehensive statistics comparing the amount of of nonimmigrant visas versus those seeking to relinquish citizenship. I think I would also say it's not just the number of individuals, but the process involved in both those processes, of course, on the on the side of individual seeking to relinquish citizenship as we've emphasized in our brief. There are very important constitutional concerns in making sure they're procedural protections that individuals are not being coerced or being pressured and relinquishing citizenship if they don't really want to or intend to. And so I do think it's not just a 1 to 1 ratio of of sort of how many appointments it's the time, the staff capacity, the expertise involved in making sure that that procedure is done. Right? And when we have to appear before a consular official, is that anybody in the consulate or is that a certain level of person that might be different than the people processing visas? It is a certain status. Your honor. I'm afraid not familiar with this sort of technical details, but it's it's not just any member of the consular staff. Okay, the processing visa doesn't require a particular status. I'm not certain of that. Your honor. I could ask the department for more information on that. All right. I don't have any more questions. Thank you very much. Mr. Schreiber will give you two more minutes. Thank you. Just a couple of points. First, with regard to, I'm just going to follow up on Judge's question about nationwide injunctions and interplay with nationwide injunctions and standing. Here, the association has standing. And even if it's one plaintiff or one member of the association, as my colleague here pointed out, I'll direct the court to JA 148. That member is still waiting, has been waiting for well over a year to receive his appointment. He has been scheduled on in November, from November 15, 2023. There are 800, at least 800 additional members who either have scheduled appointments or wish to schedule appointments, and I can try to report back to the court on that issue. But just just focus on that one member. I think we'll be fine just to report on the ones that you've already identified in the record. We don't need to create a new record. Just that one member, your honor, is sufficient for standing and for nationwide injunction. Now here, the nationwide injunction is not directed at each and every consulate. It's directed at the State Department simply to make its renunciation procedures simpler and more efficient. That does not require a case-by-case for every individual U.S. mission around the globe. Your complaint asks for them to process at a reasonable pace, quote, reasonable pace. Those were your words. And now you're saying you want them to change the process to make it simpler? That's what the injunction would do? Part of our analysis in the briefing here and below was that the method for processing these services is simply not efficient. Whether it takes too long for these interviews or whether they refuse to conduct online renunciation interviews, as it does perhaps with other services that it provides. And the very fact that, again, the record indicates that the government favors and prefers pleasure visas over renunciation services. There is no question about it. And that, your honor, cannot stand. If somebody wants to visit the United States for pleasure, he or she may try, but that should not receive preference over a U.S. citizen wishing to renounce his U.S. citizenship. Which, and I don't have to go over this, it's in the briefs, has a historical value and its importance is unquestioned. Colleagues, any questions? Thank you both very much. The case is submitted.
judges: Millett, Pillard, Wilkins